ROBERT W. DICKSON AND JEANNE K. DICKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dickson v. Commissioner
Docket No. 21346-81.
United States Tax Court
T.C. Memo 1983-723; 1983 Tax Ct. Memo LEXIS 65; 47 T.C.M. (CCH) 509; T.C.M. (RIA) 83723; December 5, 1983. Lawrence J. Hayes, for the petitioners. Dale L. Newland, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $7,398.61 in petitioners' 1979 Federal income tax. The issues for decision are (1) whether petitioners' sailboat activities constitute an activity not engaged in for profit within the meaning of section 183(a), [1](2) whether petitioners miscalculated the salvage value of their sailboat for purposes of the allowance for depreciation under section 167, and (3) whether petitioners are entitled to an investment tax credit under section 38. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of *68 facts and attached exhibits are incorporated herein by reference. Petitioners Robert W. Dickson and Jeanne K. Dickson, husband and wife, resided in River Falls, Wisconsin, when they timely filed their 1979 joint Federal income tax return and when they filed their petition in this case. After graduation from college in 1959, Robert W. Dickson (hereinafter referred to as petitioner) joined the Air Force. After undergoing training, petitioner was assigned to duty at Ramey Air Force Base in Puerto Rico in September 1961. While living in Puerto Rico, petitioner became interested in sailing and purchased his first sailboat. About three years later, petitioner was reassigned to Fairchild Air Force Base in Spokane, Washington. While at Fairchild, petitioner traveled as frequently as possible to Seattle to sail with friends. In 1965, petitioner left the Air Force and went to work for Northwest Airlines. After several months training, petitioner was assigned to the Seattle area. About one week later, petitioner bought a 26-foot Thunderbird sailboat. In 1971, petitioner sold his Thunderbird and bought a Robb 3510, a 35-foot sailboat. Petitioner paid $18,000 for the boat and made *69 renovations and improvements costing about $12,000. Petitioner sailed extensively in the Pacific Northwest and Canada. During this period petitioner listed his boat with a charter fleet. The boat was never chartered and was withdrawn from the charter market after a short period as petitioner determined the boat's cabin was too small for the needs of charterers. Moreover, the boat was made from materials requiring expensive maintenance, and the sailing season in Seattle was too short. Petitioner sold the Robb 3510 in 1976 for $29,000. Meanwhile, in about 1973 or 1974, petitioner moved from Seattle to St. Paul, Minnesota. In 1975, he bought a small sailing catamaran which he has used for recreation up to the time of trial. In 1977, petitioner chartered a sailboat for the week from Fleet Indigo, Ltd. (hereinafter referred to as Fleet Indiog) on the island of Tortola, British Virgin Islands, in the Caribbean. The boat chartered was a 37-foot yacht, known as the Irwin 37. While in Tortola, petitioner discussed the charter business with several charter fleet operators, including Moorings, CSY, Caribbean Yacht Charters and Fleet Indigo. Fleet Indigo was the third oldest chartering *70 company in the British Virgin Islands and one of the most respected and successful. Petitioner reviewed some financial records of Fleet Indigo during his visit. Tortola is the area where most charter fleets for the region operate. Petitioner's 1977 vacation in Tortola enabled him to investigate the sailboat chartering business at close hand. One negative factor discouraging petitioner in 1977 from buying a boat to be placed with a charter fleet was the difficulty in getting to Tortola. Travel to Tortola from the United States was time consuming and relatively expensive. Changes in aircraft and an overnight stay en route were necessary. Petitioner's interest in sailboat chartering did not wane. He read many articles on chartering in the various magazines on sailing and yachting. Petitioner wanted to own and pilot his own charter boat upon retirement. He hoped to own a relatively large boat. He felt that, if the value of a smaller boat, in the range of 36 to 62 feet in length, would keep up with inflation and produce enough revenue from chartering in the meantime, he would be able some day to afford the larger boat. Petitioner continued to receive quarterly newsletters *71 and magazines from several of the Tortola operators. In 1979, he noticed that several of the Tortola operators were starting charter fleets in Central America. Fleet Indigo was franchising a group to open a fleet in Belize, a country on the Yucatan Peninsula formerly known as British Honduras. Belize is 1300 statutory miles west and 50 statutory miles south of Tortola. Petitioner became interested in the idea of a charter fleet in belize for several reasons. First, there were direct flights to Belize from New Orleans and Miami. The inconvenience and expense becessary when traveling to Tortola were eliminated. Second, the air fare to Belize was less expensive than to Tortola. Lastly, a barrier reef lies off the coast of Belize and provides protected waters for sailing and underwater recreation. Belize had its drawbacks as a tourist sailing center. There were very few first class hotels and Fleet Indigo was the only charter fleet operator. Another charter firm had tried to operate there but had not been able to start up due to the nature of the economy and the charter business. Petitioner telephoned seven owners of boats who then had chartering arrangements with Fleet *72 Indigo in Tortola. The names of the owners were chosen from a list of all owners then supplying boats to Fleet Indigo. The list was generally provided by Fleet Indigo to prospective owner/lessors. As petitioner was interested in boats 36 to 42 feet long, he only contacted owners whose boats were in this size range. From these conversations, petitioner determined the owners contacted were satisfied with Fleet Indigo's operation in Tortola, including boat maintenance and the payment of lease rentals. Petitioner learned the owners observed annual increases from 15 to 25 percent in charter rates, depending on the year and season. The owners indicated they expected to realize profits on the sale of their boats due to the effects of inflation increasing the value of sailboats generally. Petitioner also inquired what success the owners enjoyed in keeping their boats on charter. Fleet Indigo informed petitioner that boats in their fleet were chartered about 27 weeks a year, although some boats were employed for as much as 34 or 35 weeks. The greatest charter activity occurred in the high season, running approximately from mid-December through mid-April, when charter rates were higher. *73 Of the 27 weeks a boat might be expected to be chartered, about 12 weeks would fall within the high season. Petitioner also talked with yacht brokers and was told the value of sailboats generally was staying up with the rate of inflation. There was a strong market for yachts in 1979. An expectation of annual market increases of eight to ten percent in the value of used sailboats was reasonable in 1979. Petitioner made some rudimentary calculations aimed at determining the financial prospects of his plan. Fleet Indigo would give petitioner a four-year lease on standard terms calling for rental payments from Fleet Indigo of $7,725 per year, payable quarterly. From this income, petitioner deducted the cost of insurance, then amounting to $1,200 per year and his interest expense for a loan he would need to purchase the boat and figured he would realize a net loss of approximately $1,000 per year. To cover this loss and make an operational profit, petitioner considered he could charter his boat to others for his own account on days reserved under his lease for personal use. Fleet Indigo's published charter rates for the 1979-80 season ranged from $735 to $1,225 a week. Petitioner *74 remained mindful of the prospect that charter rates might continue to climb as he understood they had in the recent past.Petitioner did not take into account the impact of depreciation deductions in calculating the profitability of his scheme. Of principal importance to petitioner's analysis was his belief that a boat of the kind under consideration would appreciate in value over its cost. He determined he would be able to sell or otherwise dispose of the boat for a profit over his purchase price and reinvest the proceeds or trade in his boat for the larger boat he wanted once he retired. Petitioner would not have gone ahead with this plan unless he believed the boat would appreciate in value. Petitioner intended to derive a profit from the rental activities, and, even if no profit from operations would result, to realize an overall profit from appreciation in an amount which would exceed the expenses of operation. After considering the prospects for income for the near term, the fixed income to be afforded by a lease with Fleet Indigo for a four-year term, and, most importantly, the expected appreciation in value of his boat, petitioner entered into an agreement with Yacht Charter *75 Systems Ltd. (Yacht Charter) on October 18, 1979, for the purchase of an Irwin 37 for delivery in Belize. The purchase price was $65,000, of which 25 percent was paid on signature of the agreement with the remainder due on delivery of the boat. Petitioner also agreed to pay $3,500 for delivery, commissioning and sea trials. The boat was ordered with equipment specified by Yacht Charter for use by Fleet Indigo in its charter fleet. Yacht Charter owned Fleet Indigo. Such items included pots and pans, a stereo system, special refrigeration units, safety equipment, and deck gear. Petitioner named his boat the Aveia.
On the same day petitioner signed the purchase agreement with Yacht Charter, he executed a lease agreement with Fleet Indigo. Generally, lease arrangements with Fleet Indigo followed a sale of a boat by Yacht Charter. The lease was for a four-year term at a rent of $7,725 per year payable in quarterly installments.Fleet Indigo was responsible for the moorage, maintenance, and chartering of the boat at its own expense. All income from charters was earned by Fleet Indigo. Petitioner's sole responsibility was limited to paying the premiums on insurance procured *76 by Fleet Indigo covering the Aveia, provided that any annual premium expense in excess of $1,200 was to be borne by Fleet Indigo. Petitioner could have insured the boat for about $750, if it was not to be used at all. Petitioner could have personal use of his boat for an aggregate of 28 days per year, which were designated "guaranteed days", provided (1) only seven days could be taken within the high season and (2) Fleet Indigo could refuse such use if the boat was already chartered for the period. Petitioner could use his boat in excess of the 28 guaranteed days by (1) paying the going charter rate, less a 15 percent discount for guaranteed availability, or (2) paying $15 per day if availability was not to be guaranteed. Petitioner could swap guaranteed day rights with other owners leasing to Fleet Indigo or book any other boat on an "as available" basis. Petitioner never used any other boat in the fleet on this basis. Petitioner paid $17,525 of the purchase price of the boat before its delivery and borrowed $51,500 from Manufacturers Hanover Trust Company of New York to pay the balance due on the purchase agreement. The loan was payable monthly over a term of 180 months *77 (15 years) and bore interest at the rate of 12.02 percent per annum. Monthly payments were $618.72. The loan was secured by a first preferred ship mortgage recorded with the Second Coast Guard District, Port of Minneapolis, Minnesota. The boat was delivered in Belize sometime in mid-November 1979 and went into service shortly thereafter. Petitioner received $794.02 in rent from Fleet Indigo for the days the Aveia was available for charter during 1979. Petitioner and his wife included the $794.02 in their Federal income tax return for 1979 and deducted $1,150 for depreciation on the Aveia and $661.54 interest expense on the boat loan, yielding a net loss of $1,017.52 on the activity for 1979. Petitioners' return was prepared by an income tax preparer and showed the Aveia had a ten-year useful life with no salvage value. Depreciation was calculated on the straight line method. Petitioner also claimed an investment tax credit of $6,900 for the purchase of the Aveia.
In an effort to secure bookings for the Aveia for petitioner's own account on his guaranteed days, petitioner distributed charter sailing brochures prepared by Fleet Indigo to fellow Northwest *78 Airline pilots in the St. Paul, Minneapolis area and posted three by five-inch cards offering the boat for charter on bulletin boards in crew lounges of various airlines in various airports throughout the country. These efforts started in the last days of 1979 and produced about 30 inquiries by the spring of 1980. Petitioner first saw the Aveia in March 1980 when he traveled to Belize and sailed his boat for recreational use for 10 days. The Aveia was then very new and was satisfactorily maintained by Fleet Indigo. Petitioner's only other use of the Aveia came in March 1981 when he acted as first mate to a friend who chartered the boat for one week for $1,250. Fleet Indigo paid the first two quarterly rental payments for 1980. However, the charter business experienced an unexpectedly difficult high season that year and Fleet Indigo began to experience financial problems by the summer of 1980. In an attempt to conserve working capital, Fleet Indigo issued a promissory note payable December 31, 1980, or January 1, 1981, as petitioner should elect, to cover its third quarter rent. The fourth quarter, 1980 and first quarter, 1981 lease payments were tendered in the *79 form of promissory notes payable one year from issue. Although the promissory note issued to cover the third quarter, 1980 rent was paid by April 1, 1981, the remaining notes were never paid. Petitioner stopped his personal advertising of the Aveia for charter after he learned of Fleet Indigo's financial problems. Petitioner never advertised the availability of the Aveia for charter in any newspaper or magazine. A meeting between the management of the Belize operation and the owners of boats with Fleet Indigo in Belize, including petitioner, occurred in Newark, New Jersey in September 1980. Petitioner also attended a meeting in Tampa, Florida, in March 1981, at which the Fleet Indigo management and the boat owners were present.Despite all efforts, Fleet Indigo ceased operations by the summer of 1981. As the Belize end of Fleet Indigo's business was structured on a franchise basis, the Belize franchisees decided to continue their fleet charter operations despite Fleet Indigo's demise. Some of the owners of boats formerly leased to Fleet Indigo in Belize, including petitioner, agreed to keep their boats in Belize. Others quit Belize altogether. Consequently, the *80 former franchisees commenced charter fleet operations as Sail Belize, Inc. (Sail Belize) and entered into new agreements with the remaining boat owners. Petitioner and Sail Belize entered into an Owner Yacht Management, Maintenance and Operating Agreement on January 1, 1982 (hereinafter referred to as the management agreement). The management agreement essentially varied from the Fleet Indigo lease. Sail Belize was responsible for the management and control of the Aveia. Petitioner was responsible for the costs of insuring, maintaining, and provisioning the Aveia. All charter proceeds were to be split equally between petitioner and Sail Belize. The risk of obtaining charters and charter income rested with petitioner. Petitioner agreed to pay Sail Belize fixed sums each month for berthage and accounting. The management agreement limited petitioner's personal use of the Aveia to no more than 14 days per year. Petitioner did not keep detailed records or books of account on the Aveia during the period it was leased to Fleet Indigo. His records disclose the payment of insurance premiums and loan payments to the lender and the receipt of rental payments from Fleet *81 Indigo. A ship's log was maintained on board the Aveia. Rental payments from Fleet Indigo and payments to the lender and insurer were made through petitioner's personal bank account. No maintenance records for the Aveia were accumulated by petitioner or received from Fleet Indigo during this period, as Fleet Indigo was responsible for the maintenance of the boat. Following the management agreement with Sail Belize, petitioner's records show more detail of charter fees received, expenses and costs associated with each charter, and maintenance performed. These records were produced by Sail Belize under the terms of the management agreement. Petitioner's activities regarding the Aveia for the 1980 and 1981 show the following results: 1980
charter rentals
$ 5,793.75 interest
$ 8,313.27
depreciation
4,499.18
insurance
1,173.70
repairs
155.00
trip to inspect
charter operation
365.10
$14,506.25
$ (14,506.25)
net loss
$ ( 8,712.50)
1981
charter rentals
$ 3,156.67 interest
$ 7,122.50
depreciation
4,499.18
insurance
1,128.00
supplies
235.00
documentation of boat
215.00
travel expense to meetings
204.75
charter expense
486.00
travel expense
205.00
$14,095.43
$ (14,095.43)
net loss
$ (10,938.76)
*82 For 1980 and years following, petitioner redetermined the useful life of the Aveia for depreciation purposes to be 15 years rather than ten years as used in his 1979 Federal income tax return.This change was suggested by an agent of respondent during the examination of petitioners' 1979 return. Petitioner continued to calculate depreciation on the straight line method and on the assumption the Aveia would have no salvage value at the end of its useful life. Respondent determined the loss of $1,017.53 for 1979 was not allowable because petitioner failed to show the loss was either incurred in a trade or business or with respect to property held for the production of income. Respondent disallowed the investment tax credit on the ground the Aveia was not held for use in a trade or business or for the production of income. In his amended answer, respondent alleged in the alternative that, if petitioner was found to have engaged in the boat activity for profit, then the Aveia was not subject to an allowance for depreciation and was not section 38 property for purposes of the investment tax credit, in view of petitioner's determination that the boat would appreciate *83 in value.
ULTIMATE FINDING OF FACT The salvage value of the Aveia was at least equal to its cost to petitioner. OPINION The first question to be decided is whether the deductions disallowed by respondent stem from an activity not engaged in for profit within the meaning of section 183(a). [2]
*84 An activity is not engaged in for profit unless the taxpayer has a predominant purpose and intention of making a profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue, 615 F.2d 578 (2d Cir. 1980).Although it is not necessary for a taxpayer's profit intention to be reasonable as measured by business or other standards, nevertheless the taxpayer must have an actual and honest profit objective. Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. in an unpublished opinion (D.C. Cir. February 22, 1983); sec. 1.183-2(a), Income Tax Regs.
The determination of the taxpayer's objective is based on all the facts and circumstances, with greater weight given to objective facts than to the taxpayer's mere statement of his intent. Churchman v. Commissioner,68 T.C. 696, 701 (1977); sec. 1.183-2(a), Income Tax Regs. *85 Petitioner bears the burden of proof in this factual inquiry. Engdahl v. Commissioner,72 T.C. 659 (1979); Benz v. Commissioner,63 T.C. 375 (1974); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1.183-2(b), Income Tax Regs., lists some of the factors which normally are taken into account in making a determination of the taxpayer's objective. [3] These factors are not intended to be exclusive and no one factor or a majority of nine factors need be considered determinative. Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. in an unpublished opinion (9th Cir. March 25, 1981); Benz v. Commissioner,supra at 382-383. We hold petitioner's activity regarding the Aveia was engaged in for profit for the tax year before the Court. An analysis of the factors relevant to this case follows. *86 FACTOR (1): The manner in which the taxpayer carries on the activity.
The maintenance of complete and accurate books and records is an element in this factor. The records maintained by petitioner during the time the Aveia was leased to Fleet Indigo were scant; but the obligation of boat provisioning and maintenance and the benefits of charters were those of Fleet Indigo, and not petitioner. The relevant financial events during the time the Aveia was with Fleet Indigo were lease payments incoming and loan and insurance payment outgoing. Petitioner did not keep a separate bank account or books for these transactions, but his records, nevertheless, adequately reflect these transactions. Engdahl v. Commissioner,supra at 666. The scope and detail of record keeping improved after the commencement of Sail Belize. Petitioner continued to use his personal bank account for this activity. Respondent points out this change occurred after his audit of petitioner's income tax return for 1979 and would have us infer a tax motive from this alteration. While respondent's audit of petitioner's return may have prompted petitioner to focus more sharply *87 on all aspects of his boat activities, the change in record keeping was primarily occasioned by the loss of the Fleet Indigo lease and the new arrangements with Sail Belize. After the failure of Fleet Indigo, petitioner became responsible for the costs of maintaining, provisioning, and operating the boat and could look only to chater customers of Sail Belize for operating revenues. We find petitioner's record keeping was adequate. Respondent also points to petitioner's efforts to advertise his boat as evidencing a lack of profit objective. We found petitioner commenced a limited program of advertising by leaving brochures with fellow employees and posting notices in crew lounges around the United States. No newspaper or magazine advertising was undertaken. Petitioner explained he abandoned his advertising plans when the financial status of Fleet Indigo became doubtful, as he did not want to become liable to reimburse advance deposits to charterers if Fleet Indigo failed. We are unconvinced. There is no showing that revenues from charters for petitioner's own account were required to be run through Fleet Indigo. More importantly, petitioner did not resume advertising upon *88 the starting up of Sail Belize. We find petitioner's advertising efforts were inadequate. On balance, the manner in which petitioner carried on his activity is not convincing. His advertising efforts, the key element in attracting potential customers for guaranteed days income, withered when they should have increased. FACTOR (2): The expertise of the taxpayer in carrying on the activity.
Petitioner first encountered charter operations in the early 1970's when he briefly listed his Robb 3510 for charter. This experience indicated the necessity of having a boat designed and outfitted for easy maintenance and the needs of charterers. Thereafter petitioner read articles appearing in the yachting and sailing press on the subject. Whereas we do not place great weight on these activities, they indicate a desire to be informed.
In 1977, petitioner chartered a yacht in Tortola and spoke to at least four firms about chartering operations. Petitioner decided against entering the market in 1977 on the basis of the difficulties and expense in getting to the British Virgin Islands. When petitioner noticed the opening of a new charter market in Belize in 1979, he reconsidered *89 his conclusion. Petitioner discovered Belize offered good yachting waters and was relatively easy and inexpensive to reach. He consulted with seven boat owners who had lease arrangements with Fleet Indigo in Tortola. Petitioner conferred with yacht brokers about the future values of sailboats. We find that petitioner's investigations and preparations were adequate to the purpose of a profit objective. FACTOR (4): The expectation that assets used in the activity may appreciate in value.
Petitioner asserts he bought and held the Aveia to produce income from charter operations and to produce gain through appreciation of the boat. Section 1.183-2(b)(4), Income Tax Regs., states in part: The term 'profit' encompasses appreciation in the value of assets, such as land, used inthe activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses *90 of operation. Petitioner determined he would realize a profit on the sale of the Aveia on the basis of the trends in prices of used sailboats then being experienced Petitioner's views were formed through contacts with other boat owners and yacht brokers. Although the statements of other owners and brokers might be considered inherently suspect, either because of unbridled enthusiasm or conflicts of interest, petitioner's expert witness provided credible testimony that sailboats of the sort under consideration were then increasing in value by eight to ten percent per year. Petitioner actually and honestly expected his boat to appreciate and the rents to cover his expenses in the meantime. This is an indication of a profit objective. Engdahl v. Commissioner,72 T.C. 659, 669 (1979). FACTOR (6): The taxpayer's history of income or losses.
Petitioner has only realized net losses from his activity. A series of losses might be evidence that an activity is not engaged in for profit. Sec. 1,183-2(b)(6), Income Tax Regs.; Jasionowski v. Commissioner,66 T.C. 312 (1976). *91 Our review of the record, however, does not confirm this hypothesis in this instance. For the years in the record, the losses derive substantially from the downturn in business in the boat charter industry. These losses were sustained through unforeseen circumstances beyond petitioner's control and, therefore, are not an indication that the activity is not engaged in for profit. Sec. 1,183-2(b)(6), Income Tax Regs; Allen v. Commissioner,72 T.C. 28, 35 (1979). FACTOR (9): Elements of personal pleasure or recreation.
A factor calling for close scrutiny concerns the degree to which personal pleasure or opportunities for recreation influenced petitioner to engage in the activity. The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved * * * An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity *92 to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph. [Sec. 1.183-2(b)(9), Income Tax Regs.] Clearly, petitioner enjoys sailing. Petitioner's ultimate retirement objective is to captain his own boat for charter. Petitioner's use of the Aveia was limited to ten days in 1980 for recreational purposes and seven days in 1981 when a friend chartered the boat for pay and petitioner went along to assist. The 1981 use enabled petitioner to earn income from the activity and does not amount to personal or recreational use. "[S]uffering has never been made a prerequisite to deductibility." Jackson v. Commissioner,59 T.C. 312, 317 (1972). No personal use of the Aveia was made by petitioner during 1979, the year at issue. Although we must and will closely scrutinize any likely activity for personal motives, we do not think ten days use over the years in the record is sufficient for us to classify the activity as one not engaged in for profit. Respondent points to provisions in the Fleet Indigo lease which allowed boat *93 owners to use the boats of other owners for a small daily fee if the other boat was not to go out on a full rate charter. Petitioner never exercised his rights under these provisions. Nevertheless, respondent asserts the nearly unlimited potential for personal use of other boats, even though not exercised, is enough to require this Court to hold petitioner's activity was not engaged in for profit. We do not agree. There is no suggestion petitioner bargained for this right prior to executing the lease. Furthermore, the mere existence of rights to use the boats of others as contained in a standard form contract, left unutilized, does not indicate either petitioner derived any personal pleasure or had any purpose or motivation of deriving personal pleasure from the activity. Although the results of our analysis of the record are mixed, we conclude that petitioner has sustained his burden of proof on this matter. Of importance is the fact that there was an economic downturn, not anticipated, which was a dominating force for the very few years in the record, coupled with an actual and honest objective of profit, principally through appreciation, and limited personal use. We hold *94 petitioner's activity regarding the Aveia for 1979 was engaged in for profit. Respondent argues petitioner engaged in two different activities, each of which should be separately measured against the standards of section 183. In this way the boat operation would be divided into chartering and holding for appreciation. The characterization of the boat activities as one activity is neither artificial nor unsupportable by the facts and circumstances. We conclude petitioner's boat operation constitutes but one activity. As we have found petitioner's boat activity was engaged in for profit, we must consider respondnt's alternative argument. Respondent contends (1) the Aveia's reasponable salvage value for purposes of determining a deduction for depreciation under section 167(a) was in excess of its cost basis, (2) consequently, petitioner is not entitled to an allowance for depreciation under section 167, and (3) petitioner is not entitled to an investment tax credit under section 38. We hold the Aveia's salvage value was miscalculated and is at least equal to petitioner's cost basis. However, petitioner is entitled to an investment tax credit, and to the extent set *95 out in sectin 167(f), an allowance for depreciation. At the outset, we note respondent first raised this issue in an amendment to his answer made upon leave granted by this Court under Rule 41(a), Tax Court Rules of Practice and Procedure. This constitutes a new matter for which respondent bears the burden of proof. Tauber v. Commissioner,24 T.C. 179 (1955); Rule 142(a), Tax Court Court Rules of Practice and Procedure. Respondent has sustained his burden through petitioner's unequivocal evidence. Petitioner's plans for the Aveia were designed to provide a source of funds which would enable him to acquire a larger boat for chartering activities upon retirement. Essentially, petitioner has argued and we have found that the Aveia was held for ultimate sale or other disposition at a profit over cost basis; that is, the boat was held for the production of income within the meaning of section 212(1). [4]Clearly, "income" for purposes of section 212(1) includes gain from disposition of property which may be realized in a subsequent taxable year. Sec. 1.212-1(b), Income Tax Regs. *96 The ordinary and necessary expenses paid or incurred for the management, conservation, or maintenance of property held for the production of income are deductible under section 212(2).Property held for the production of income generally is subject to an allowance for depreciation under section 167(a).[5]
The Supreme Court characterized the *97 depreciation allowance as follows: The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein. [Detroit Edison Co. v. Commissioner,319 U.S. 98, 101 (1943)] [emphasis supplied]. Petitioner contends the Aveia is a capital asset which will physically deteriorate, for which a deduction for depreciation is required by section 167. Assuming the Aveia is subject to physical deterioration, it does not follow that the salvage value of the boat is zero or that petitioner must be granted a deduction for depreciation. Although the object of the depreciation deduction is to take account of the loss in value of a capital asset *98 caused by exhaustion, wear and tear (including obsolescence), the taxpayer does not directly estimate the amount of this loss. Rather, the taxpayer is required first to estimate the salvage value of the property as at the end of its useful life [6] and subtract this amount from the cost basis of the property; the resulting figure represents the amount to be taken as a deduction for depreciation through an annual charge. Sec. 1.167(a)-1, Income Tax Regs.; Massey Motors v. United States,364 U.S. 92, 105 (1960). Although some of the methods used to calculate the annual depreciation deduction do not mechanically take into account salvage value, it is beyond question that property is not depreciable below its salvage value. Sec. 1.167(a)-1(a), Income Tax Regs.; see Hertz Corp. v. United States,364 U.S. 122 (1960). Here petitioner used the straight line method under which salvage value is the sine qua non of the deduction. *99 Because the taxpayer must determine the salvage value of property at the time the property is placed into service, the taxpayer's determination is an estimation only. Massey Motors v. United States,supra at 104; sec. 1.167(a)-1(c)(1), Income Tax Regs. Although there is always the risk that a mistake will be made in the estimation, "prediction is the very essence of depreciation accounting." Massey Motors v. United States,supra at 105. However, allowing the taxpayer to predict a value as of a date in the future, in many cases decades away, does not grant license to the taxpayer to do so in an arbitrary or unreasonable manner. "[I]t is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use * * * of the asset to the periods to which it contributes. * * * Obviously a meaningful annual accrual requires an accurate estimation of how much the depreciation will total. The failure to take into account a known estimate of salvage value prevents this * * *." Massey Motors v. United States,supra at 104. *100 Salvage value is the amount the taxpayer estimates will be realized when the property is no longer needed or used. Sec. 1.167(a)-1(c)(1), Income Tax Regs. It must include an estimate of resale or second-hand value. Massey Motors v. United States,supra at 107. As we have noted, the taxpayer must not make a determination of salvage value on arbitrary or unreasonable grounds, but must use a reasonable effort to arrive at an accurate calculation of what will be realized when the property is no longer needed or used. Petitioner's determination that the Aveia would be worthless at the end of its useful life fundamentally and irreconcilably clashes with his view that he expected the boat to appreciate in value. Either petitioner expects to sell his boat at a profit or he does not. Petitioner testified that he was advised, and believed, that boats of the sort he purchased would appreciate in value. Petitioner planned ultimately to sell or trade his boat for the larger boat he would obtain for charter. Petitioner's own expert witness *101 corroborated petitioner's testimony that boats were then appreciating in value. Petitioner's own evidence has made respondent's case to the extent that the salvage value of the Aveia was at least equal to petitioner's cost basis in the boat. It cannot be disputed that respondent may require a redetermination of salvage value when it becomes apparent that it has been miscalculated. See Fribourg Navigation Co., Inc. v. Commissioner,383 U.S. 272, 277 (1966). Consequently, we hold that the salvage value of the Aveia was miscalculated and was at least equal to cost basis. See R.E. Moorhead & Son, Inc. v. Commissioner,40 T.C. 704 (1963); Vidican v. Commissioner,T.C. Memo. 1969-207. Petitioner argues that an objective of profit principally through appreciation has no role to play in the determination of the depreciation deduction. He points to section 1.167(a)-1, Income Tax Regs., the pertinent parts of which read: (a) * * * The allowance [for depreciation] shall not reflect amounts representing *102 a mere reduction in market value. * * * * * * (c) * * * Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. * * * Petitioner argues, in effect, that those sentences mean that changes in levels of prices should be ignored for purposes of the depreciation deduction. We do not agree. The first quoted sentence means that loss of value due to mere market forces is not in itself a cause of loss to the taxpayer which the depreciation deduction is intended to reach. Mere fluctuations in the price of property cannot constitute an expense unless and until fixed by a taxable event. Petitioner did not expect a loss at all.Petitioner's case is built upon his belief, honestly and actually held, that the Aveia would appreciate in value and yield a profit. We perceive a substantial difference between mere fluctuations or changes in prices and petitioner's firm expectations. He would not have purchased the boat unless he was convinced it would appreciate. The remainder of the quotation speaks only *103 to the effect of changes in price levels once salvage value has been properly determined. It lays down no rule regarding the original determination of salvage value. It suggests that it would be administratively burdensome and of no purpose to endlessly adjust salvage value for every twitch in price levels. This is not our case.
The Supreme Court's decision in Fribourg Navigation Co., Inc. v. Commissioner,383 U.S. 272 (1966), is distinguishable from the instant case. The issue raised in Fribourg was whether a taxpayer was allowed a depreciation deduction in the year an asset was sold when the sales price was substantially in excess of its adjusted basis. The Commissioner determined the taxpayer suffered no economic loss in the year of sale because the sales price made the taxpayer whole for any loss suffered through depreciation that year. The salvage value and useful life established by the taxpayer when the property was originally put into service were reasonable. However, unexpected events, beyond the control of the taxpayer, unleashed temporary market forces which placed a substantial scarcity value on the property. The taxpayer yielded to the temptation *104 to take advantage of the situation and sold the property for a substantial gain before the end of the originally estimated useful life. In Fribourg, the Supreme Court said: "This carefully constructed regulatory scheme provides no basis for disallowances of depreciation when no challenge has been made to the reasonableness or accuracy of the original estimates of useful life or salvage value." Fribourg Navigation Co., Inc. v. Commissioner,supra at 278. The Supreme Court also observed that the Commissioner's argument commingled two distinct concepts of tax accounting--depreciation and fluctuations in value through changes in price levels or market values taxed under capital gains and losses rules. See sec. 1.167(a)-1(c), Income Tax Regs.; Macabe Co. v. Commissioner,42 T.C. 1105 (1964).The Supreme Court held the taxpayer had a right to a depreciation deduction for the year of sale. It is evident that Fribourg has no application to the instant case. In Fribourg, the effect of market forces was unexpected, *105 whereas petitioner anticipated profit from market forces. In Fribourg, the determination of salvage value was not challenged, whereas respondent is challenging the reasonableness and accuracy of petitioner's original estimate of salvage value. In Fribourg, the result in part turned on the proper analysis of the tax accounting concepts of depreciation and the effect of market forces on capital gains and losses.In that case, section 1.167(a)-1(c), Income Tax Regs., as stated above, specified that the two concepts were separate in respect of changes in price levels after the determination is made. The Supreme Court drew support for this rule from the enactment of the various recapture provisions in the Internal Revenue Code such as sections 1245 and 1250. The issue resolved by the Supreme Court was the tension between the taxpayer's estimation of salvage value and the actual, later results of sales of such property as shaped by market forces; that is, the difference in the assumed rate of decline in value and the actual rate of decline in value. The recapture provisions were designed to meet this problem, whereas the depreciation provisions *106 by their own terms were not. The Supreme Court in no way addressed the issue now before us.Although the recapture provisions would serve to tax, at ordinary rates, any amounts taken as depreciation by petitioner, they do not address the issue now before us.However, the depreciation provisions require petitioner to estimate a salvage value. Petitioner's objective for spending nearly $70,000 was the opportunity to make a profit, principally by market forces he believed would run in his favor. The record, including petitioner's own testimony, assures us that such would be the case. Petitioner was charged with making a reasonable estimation of salvage value and failed to do so. Nothing in section 167 or the regulations promulgated thereunder conflict with this result or direct otherwise. The present case is also distinguishable from a number of cases wherein we allowed the taxpayer to depreciate property held for the production of income by sale or other disposition. See Robinson v. Commissioner,2 T.C. 305 (1943); Rouse v. Commissioner,39 T.C. 70 (1962); Mitchell v. Commissioner,47 T.C. 120 (1966); and Nash v. Commissioner,60 T.C. 503 (1973). *107 [7] In each of these cases the Commissioner did not challenge the taxpayer's determination of salvage value and did not make the arguments made here.Furthermore, each of these cases concerned nondepreciable land with depreciable improvements. Our holding herein is not that the Aveia is not property held for the production of income as described in sections 212(1) or 167(a)(2), for it is such property. We are concerned with petitioner's setting of salvage value for the property. *108 Petitioner's complaint that taxpayers should not be required, as a matter of policy, to take into account the effects of inflation for estimating salvage value is misdirected under these circumstances. That is a legislative matter which Congress has not seen fit to address. Although we have held that petitioner's salvage value in the Aveia is at least equal to his cost basis, petitioner has the right, afforded under section 167(f), [8] to reduce salvage value by up to ten percent of cost basis. This makes clear that the Aveia is property with respect to which depreciation is allowable. As respondent asserted that an investment tax credit was not available to petitioner on the grounds that depreciation was not allowable on the Aveia, and we have held against respondent on that issue, respondent's argument on the investment tax credit issue is without merit. [9]
*109 We have considered all other arguments of the parties and find they are without merit. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.↩
2. Section 183(a), (b) and (c) provided: (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.-- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
3. The factors are: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation.↩
4. Section 212(1) and (2) provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income. ↩
5. The pertinent part of section 167(a) provides: There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, or (2) of property held for the production of income.↩
6. Respondent has not challenged petitioner's determination of useful life.↩
7. See also our opinions in Sherlock v. Commissioner,T.C. Memo. 1972-97, and Markward v. Commissioner,T.C. Memo. 1978-312. In Sherlock, the taxpayers held a former residence for the production of income by sale or rent. However, the sales market was unfavorable and the taxpayers eventually sold their house at a loss. The original high asking price was speculative and much higher than its market value. We rejected the Commissioner's determination that the property's salvage value should at least equal the fair market value of the house when converted from a residence to property held for the production of income because it appeared the taxpayer might rent out the house "until no longer capable of functioning." 31 TCM at 383, 387, 41 P-H Memo. T.C. par. 72,097. The taxpayer then might never have sold the house to produce income.The taxpayer's estimation of a low salvage value was supportable on this basis. The instant case is distinguishable because petitioner expected the boat to appreciate and his objective was to make a profit principally from the appreciation. See Newbre v. Commissioner,T.C. Memo. 1971-165; see also Fasan, "Maintenance and Depreciation Deductions for a Personal Residence Offered for Sale." 25 Tax Law Review 269↩ (1970).
8. The pertinent part of section 167(f) provides: (1) General Rule.--Under the regulations prescribed by the Secretary, a taxpayer may, for purposes of computing the allowance under subsection (a) with respect to personal property, reduce the amount taken into account as salvage value by an amount which does not exceed 10 percent of the basis of such property (as determined under subsection (g) as of the time as of which such salvage value is required to be determined). ↩
9. Respondent did not consider his section 38 position fully. See, e.g., Kelley v. Commissioner,T.C. Memo. 1982-728↩.